**IN THE COURT OF APPEALS OF IOWA**

No. 25-0138
Filed April 23, 2025

**IN THE INTEREST OF A.M.,**
**Minor Child,**

**T.H., Mother,**
　　Appellant.
_____

　　Appeal from the Iowa District Court for Linn County, Carrie K. Bryner, Judge.

　　A mother appeals the termination of her parental rights to her child. **AFFIRMED.**

　　Alexander S. Momany of Howes Law Firm, PC, Cedar Rapids, for appellant mother.

　　Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

　　Kristin L. Denniger, Mount Vernon, attorney and guardian ad litem for minor child.

　　Considered without oral argument by Ahlers, P.J., and Badding and Buller, JJ.

**BADDING, Judge.**

In its ruling terminating the mother's parental rights to her daughter under Iowa Code section 232.116(1)(f) (2023), the juvenile court stated it was "absolutely certain" of two things: "First, [the mother] loves her daughter very much. Second, [the mother] is in an incredibly abusive relationship . . . and she is in incredible danger." Because of that dangerous situation, the court found the child could not be safely returned to her mother's custody. The mother appeals, challenging the statutory ground for termination and the court's failure to apply the permissive parent-child bond exception. She alternatively requests more time for reunification. We affirm upon our de novo review of the record. *See In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022).

I.      **Background Facts and Proceedings**

This child welfare proceeding began in March 2022 when the Iowa Department of Health and Human Services received a report that the mother and her boyfriend, Cordell, were "using ecstasy, cocaine, and unknown pills in the home where the children reside." During its investigation into the report, the department learned that the mother's two children—A.M., who was born in 2018, and her younger sibling—had been living with their maternal great-grandmother since December 2021.[1] The great-grandmother told a child protective worker that she could not keep caring for the children on her own, but she was worried about them going back to the mother because her relationship with Cordell was abusive.

---

[1] A.M. and her sister have different fathers. The juvenile court terminated the parental rights of A.M.'s father, and he did not appeal. The younger child was placed in her father's custody, and her case was closed through a bridge order. *See* Iowa Code § 232.103A(1). She is not at issue in this appeal.

The juvenile court adjudicated A.M. as a child in need of assistance and removed her from her mother's custody in April 2022. The mother did not attend the adjudicatory hearing, later telling a case manager from the department that Cordell had pushed her down the stairs to keep her from leaving. The mother obtained a protective order against Cordell and began participating in services, including individual therapy, domestic violence counseling, and the parent-partner program. She also provided a negative drug screen.

The mother continued to do well over the summer. She obtained full-time employment and enrolled in college classes while maintaining her housing, therapy, and other services. Because of these positive steps, the mother began semi-supervised visitation with the children in August, despite some rumblings that the mother was with Cordell when he assaulted a family member in May. The mother maintained that her relationship with Cordell was over and worked on a safety plan with her domestic violence advocate. But in December, the mother disclosed that she was pregnant with Cordell's child. She gave birth to a son later that month.

In January 2023, the department started a trial home placement with the mother. She stopped participating in services over the next few months—blaming her new job, scheduling issues with the providers, and the children's needs—but she re-engaged in April. The mother's positive progress faltered in May when a tragedy struck the family: the accidental death of the mother's infant in his sleep. The department expanded services for the mother in the wake of that loss, making sure someone was in the home every day to help her cope.

But less than a week after the infant's death, the department found out that the mother had recently taken A.M. to Illinois to meet the child's father. The mother had been in an abusive relationship with the father, and there was a no-contact order in place between them. The department was also concerned because the father had not participated in the case, and his criminal history included convictions for controlled substances and domestic abuse assault against the mother and a previous girlfriend. Despite the department's concerns about this clandestine meeting, it implemented family preservation services to maintain the children in the mother's home. Those services were stopped in mid-May when the department learned that the mother had been speaking with Cordell for the past year while he was in prison.[2] The department ended the trial home placement and placed the children with the father of A.M.'s younger sister.

Over the next several months, the mother made some outward progress. She completed a psychological evaluation, attended therapy, participated in parenting classes, visited the children, and provided negative drug screens for the department. She also created a new safety plan and extended her no-contact order with Cordell, who was scheduled to be released from prison in January 2024. But the department was concerned about the mother's mental health, noting that she displayed "very little patience or impulse control . . . when she is frustrated or angry." The mother also had a "very contentious relationship" with the father of A.M.'s younger sister and was observed pressuring the children to report that he abused them, resulting in multiple unconfirmed assessments. Given the mother's

---

[2] The record does not state when Cordell went to prison or the convictions that led to his imprisonment.

history of domestically-violent relationships, and her tendency to avoid "taking complete accountability for her actions," the department was concerned she would "continue making detrimental choices for the safety and welfare of her children." Because of these concerns, the department and the guardian ad litem recommended changing the permanency goal for A.M. to termination of parental rights.

So, in December 2023, the State proceeded with a petition to terminate the mother and father's parental rights to A.M. Cordell was released from prison the next month and almost immediately contacted the father of A.M.'s sibling, threatening: "I got your address and everything I'm coming . . . fill your crib up with pistols because . . . you gunna need it." The department suspected that the mother gave Cordell the father's contact information. The mother, however, maintained that her last contact with Cordell was shortly after their child died. Because the mother had complied "with the expectations laid out for her" and was cooperating with the department, the case manager stated in a February 2024 report that she was "not resistant to the option of granting more time to the family to continue working towards reunification at this time."

But on the first day of the termination hearing in March, the department learned the mother was pregnant with her fourth child and due in about two weeks. The mother planned to have the child privately adopted and refused to disclose the father until the court ordered her to do so. She then admitted that in June 2023, she had visited A.M.'s father in violation of the no-contact order and believed she was pregnant with his child. The mother testified "there was alcohol involved in that encounter and a poor decision." And she acknowledged that it was not safe

for her children if she maintained a relationship with someone who had abused her before. But the mother was adamant that she had no contact with A.M.'s father or Cordell since the summer of 2023, testifying: "I'm not making the negative, self-sabotaging decisions that I was making. . . . I think about things differently now, and so I've been safe. And I know I'm safe, and I've been making good decisions." The department soon learned this wasn't true.

Several months after the last day of the termination hearing, but before the juvenile court entered its ruling, the State moved to reopen the record. The court granted that request and held a hearing in August 2024, which the mother did not attend. At the hearing, the case manager testified that the mother had resumed her relationship with Cordell. She was seen with him in March—not long after the first day of the termination hearing—and again in July. By then, they were living together, and she was pregnant with his child. The mother reached out to the case manager at the end of July, telling her "that she was scared, that she wanted to leave and she didn't know what to do." When the case manager couldn't get back in touch with the mother after that conversation, she contacted the police for a welfare check. The officer who visited the home described the mother as "scared to death" and not free to leave her home, although she was still managing to attend visits with her children.

The juvenile court entered a ruling in January 2025 terminating the mother's parental rights to A.M. under Iowa Code section 232.116(1)(f), finding the mother

> remained in contact with Cordell and lied about it. She testified several times about how dangerous Cordell was and that she understood that danger. She also testified that her daughter should not be around him. [The mother] said all of the right things about making mistakes and learning from them yet she is now back in the

> abusive situation that she testified is not safe for her daughter. There is no doubt that [the mother] is the victim of domestic abuse and the Court is very worried about her. However, the child's safety is paramount in this case.

The court concluded A.M. could not be returned to the mother's custody because "[t]here is no way to trust that she would ever be willing or able to keep the child safe" from Cordell. The mother appeals.

## II. Analysis

Although we perform a three-step analysis in conducting our de novo review of termination of parental rights, *see L.B.*, 970 N.W.2d at 313, the mother challenges only two of those steps—whether a statutory ground for termination is satisfied, and whether the juvenile court erred in failing to apply the permissive parent-child bond exception. We focus on those steps before considering the mother's alternative argument that she should have been granted an extension of time to work towards reunification. *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010) (stating we need not address a step the parent has not disputed).

### A. Statutory Ground

The mother claims "the State failed to prove by clear and convincing evidence that A.M. could not be returned to [her] immediate care and custody." *See* Iowa Code § 232.116(1)(f) (requiring clear and convincing evidence that the child cannot be returned to parental custody "at the present time"); *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (interpreting the statutory language "at the present time" to mean "at the time of the termination hearing"). In support of this claim, the mother argues that she "had succeeded in obtaining services, was suffering as the

victim of very serious abuse, and was being inhibited in her progress by a combination of other individuals and inattention or lack of services."

The mother's first two points are correct: she was successful in obtaining services, and she was the victim of very serious abuse. But despite years of services that the case manager said were "engineered to aid women in chronically violent domestic situations," the mother had not changed her thought processes or behavior. As the case manager testified, the "history of this case" is the mother accessing services from the department only to return to Cordell or another unsafe relationship. *See In re T.B.*, 604 N.W.2d 660, 662 (Iowa 2000) ("The future can be gleaned from evidence of the parents' past performance and motivations."). So, while the mother made progress in other areas, "her domestically violent relationship with the father was enough to prevent returning the child to her custody." *In re J.K.*, No. 24-0561, 2024 WL 3292695, at *3 (Iowa Ct. App. July 3, 2024), *overruled on other grounds by In re L.A.*, \_\_\_\_ N.W.3d \_\_\_\_, \_\_\_\_, 2025 WL 855764 (Iowa Ct. App. 2025); *see also In re Z.B.-D.*, No. 08-1221, 2008 WL 4877943, at *3 (Iowa Ct. App. Nov. 13, 2008) (finding the children couldn't be returned to the mother's custody where the "primary if not sole impediment to reunification was" her domestically violent relationship); *In re E.B.*, No. 22-1799, 2023 WL 386700, at *4 (Iowa Ct. App. Jan. 25, 2023) ("The parent[s'] unaddressed and unresolved domestic abuse . . . presents a danger to children if they were

returned to parental custody."). We accordingly find clear and convincing evidence to terminate the mother's parental rights under section 232.116(1)(f).

## B. Parent-Child Bond

The mother next claims "the evidence unequivocally established that the termination of [her] parental rights would absolutely be detrimental to A.M. at the time of trial due to the closeness of the bond," but the juvenile court "did not opine or address this aspect." Although Iowa Code section 232.116(3)(c) allows the court to avoid termination when "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship," the mother did not ask the court to apply this exception. *See In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018) (placing the burden to establish a permissive exception on the parent). And, as her argument recognizes, the court did not address it. We accordingly find the mother failed to preserve error on this issue. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."); *see also In re A.B.*, 815 N.W.2d 764, 773 (Iowa 2012) (applying this doctrine to termination proceedings). Even if error had been preserved, we would find the exception does not apply because there is no indication from the record that A.M. will suffer physical, mental, or emotional detriment upon termination of the mother's rights.

## C. Additional Time

The mother alternatively asks for a six-month extension to work towards reunification. But this issue was also not raised by the mother or decided by the

juvenile court. So, like the preceding issue, it is not preserved for our review. *See Meier*, 641 N.W.2d at 537. If error had been preserved, we would find that additional time is unwarranted because the mother did not identify the "specific factors, conditions, or expected behavioral changes" that will alleviate the need for removal at the end of an extension. Iowa Code § 232.104(2)(b).

**III.    CONCLUSION**

We affirm the termination of the mother's parental rights.

**AFFIRMED.**